UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MICHAEL DONOGHUE and PREMIUM
MORTGAGE CORPORATION,

               Plaintiffs,

-vs-

CYNTHIA NOSTRO, DYLAN RANDALL,
DAVID POPHAM and EVERETT FINANCIAL,
INC. d/b/a SUPREME LENDING,

               Defendants.

**DECLARATION OF
STEVEN E. COLE, ESQ.**

Case No. 6:20-cv-06100

**Steven E. Cole** hereby affirms under penalties of perjury as follows:

1. I am a partner in the law firm of Adams Leclair LLP and am admitted to practice before the courts of the State of New York and the United States District Court for the Western District of New York. My firm represents Defendant Everett Financial, Inc. d/b/a Supreme Lending ("Supreme"), and I am familiar with the facts of this action.

2. I submit this Declaration in support of Supreme's Motion to Compel Discovery and to Modify the Stipulated Protective Order, in opposition of Plaintiffs' Motion to Compel Discovery, filed April 29, 2022 [Doc. 69], and in response to Plaintiffs' Motion for Leave to File a (Second) Amended Complaint, filed April 15, 2022 [Doc. 61].

3. For the reasons set forth in Supreme's Memorandum of Law, Supreme does not oppose Plaintiffs' Motion for Leave to Amend, provided that the parties are given an opportunity to take additional discovery (and Supreme is permitted to obtain the outstanding discovery from Plaintiffs that is the subject of its motion to compel).

### I.     SUPREME'S MOTION TO COMPEL

4. The discovery requests and responses that are the subject of Supreme's Motion to Compel are attached as **Exhibits 1-8**.

5. A summary of the requests that are the subject of Supreme's Motion to Compel, Plaintiffs' responses, and the reasons the discovery is necessary is attached hereto as **Exhibit 9**, and entitled Plaintiffs' Discovery Deficiency Outline. This summary accurately states the discovery requests at issue, and (with a single exception) recites Plaintiffs' responses verbatim. Supreme has limited its motion to those requests addressing (1) specific wrongdoing alleged by Plaintiffs, including wrongful deletion or modification of Premium documents, (2) Plaintiffs' discovery of those wrongful acts and efforts at mitigation, (3) alleged damages, and (4) evidence of causation.

6. After receipt of Plaintiffs' responses to Supreme's second set of discovery requests on May 20, I did confer with Plaintiffs' counsel on May 27, 2022 about those responses. While complying with the Court's scheduling order regarding motions to compel, I will continue to discuss the deficiencies associated with Plaintiffs' most recent responses. In the event I am able to resolve those without further involvement of the Court, I will so advise the Court. For the time being, Plaintiffs' responses to Supreme's second set of discovery requests remain in dispute, and are a subject of Supreme's Motion to Compel.

7. Plaintiff's Amended Complaint, filed March 20, 2020, [Doc. 15] alleges a wide-ranging series of claims against Supreme and the Individual Defendants, each of whom are former employees of Premium Mortgage Corp. ("PMC" or "Premium"), consisting of twenty-three (23) causes of action and two hundred eighty-five (285) separate paragraphs. Supreme is named in six of the causes of action, and is alleged to have engaged in unfair

competition, conversion, and tortious interference with contract and prospective business advantage, among other claims.

8. Relative to Supreme Lending, the specific factual allegations are largely set forth in paragraphs 31 through 50 of the Amended Complaint. Those allegations include that:

- Nostro and Randall deleted Premium prospect information from Premium files and provided that information to Supreme. [Doc. 15, ¶¶ 37-38].

- For thirty days prior to his resignation from Premium, Randall continued to pre-qualify and run credit checks on prospects, but refrained from placing mortgages for these prospects so that he could place the mortgages with Supreme instead. Amended Complaint, Doc. 15, ¶¶ 39-40.

- Nostro engaged in the same activity for sixty days prior to her resignation. *Id*.

- Typically, Nostro and Randall would obtain 10-15 new mortgages each month. [Doc. 15, ¶ 39].

- Nostro and Randall improperly stole the data and information relating to the 30-45 prospects, used Premium funds to obtain credit checks and to pre-qualify the prospects. [Doc. 15, ¶ 42].

- Nostro and Randall converted the email addresses and phone numbers for Premium active files, deleting them from the PMC system, taking the information and corporate opportunities for Supreme. [Doc. 15, ¶ 43].

- Randall refrained from listing required information for Premium prospects in the Premium system, such as phone numbers and e-mails, instead taking them to Supreme. [Doc. 15, ¶ 45].

- Nostro and Randall took documents supplied by prospects of Premium with them to Supreme and failed to leave copies of them with Premium. [Doc. 15, ¶ 48].

- Nostro had several clients cancel applications with Premium, in favor of placing them with Supreme, including applications that Nostro had started with Premium. [Doc. 15, ¶ 49].

9. Supreme is alleged to have had knowledge and given direction and encouragement to Nostro and Randall regarding these activities. [Doc. 15, ¶¶ 40, 43, 49].

10. Paragraphs 31 through 50 of Plaintiff's Amended Complaint form the factual basis of their six causes of action against Supreme Lending (nos. 10, 12, 17, 19, 20, and 21). Plaintiffs seek to recover damages from Supreme Lending in the amount of $10,000,000 and reference recovery of "lost profits" at paragraphs 159, 188, 206, 213, 218-219, and 240 of the Amended Complaint.

11. In total, Plaintiffs allege that Nostro refrained from placing 20-30 mortgages prior to her resignation and Randall refrained from placing 10-15 mortgages. Combined, it is alleged that between 30 and 45 mortgages were not placed at Premium so that they could be taken to Supreme.

12. No allegation is made that any former Premium employee other than Nostro or Randall engaged in this conduct, or caused loans from Premium prospects to be placed with Supreme.

13. Supreme answered the Amended Complaint, denied the allegations of wrongdoing, and pled affirmative defenses to Plaintiffs' claims based on lack of causation and failure to mitigate damages, among others. [Doc. 19, p. 3].

14. Supreme began asking, informally, for evidence of Plaintiffs' alleged damages before this lawsuit started. Ms. Stiller's May 2, 2019 letters to Supreme, Nostro, and Randall referred to "schedules" of prequalified borrowers who had been "diverted" to Supreme. [Doc. 15-5, pp. 2, 21, 39].

15. On May 8, 2019, Supreme asked for Ms. Stiller's schedules in writing. See **Exhibit 10**, attached hereto. Plaintiffs' schedules have never been provided.

16. There is no record of written communications between Plaintiffs and Supreme between May 8, 2019 and January 6, 2020, when the original complaint was filed in this matter, a period of nearly eight months.

17. After the litigation commenced, I sought to obtain disclosure of the identity of the borrowers allegedly impacted by any wrongdoing involving the Individual Defendants in this lawsuit.

18. Between May and September, 2020, leading up to a mediation between the parties, I repeatedly reached out informally to Plaintiffs' counsel, Sharon Stiller, to obtain the names of borrowers whose business was lost or diminished as the result of wrongdoing alleged in the Amended Complaint. These efforts included email communications on May 29, June 8, June 12, July 20, July 23, July 30, July 31, August 3, August 11, and August 18, 2020, and telephone conferences in May and June, 2020.

19. During the telephone conferences, Plaintiffs' counsel disclosed orally that their damages were based on wrongdoing with respect to 188 Premium borrowers, none of whom they would identify.

20. The parties held an unsuccessful mediation on September 9, 2020. At the mediation session, Plaintiffs provided a confidential list, for mediation purposes only, of 74 borrower names, and conditioned Supreme's receipt of the list on assurances that the list would only be used in mediation.

21. Following the unsuccessful mediation, all parties served their Initial Disclosures under Fed.R.Civ.P. 26(a) and issued discovery requests to the other parties. Plaintiffs' Initial Disclosures were served on October 30, 2020 and, in addition to repeating the claim for $10 million of unspecified damages, apparently not tied to loan revenue,

disclosed that "some of its lost revenue from the actions of Defendants in relation to **misappropriated clients** is in the sum of $500,191.00" as of October 30, 2020, exclusive of interest. Plaintiff's Initial Disclosures, October 30, 2020, ¶ 3. [**Exhibit 11**] (emphasis supplied)

22. Plaintiffs Initial Disclosures did <u>not</u> include, as required by Rule 26(a)(1)(A)(iii), "a computation of each category of damages claimed by the disclosing party--who must also make available for inspection and copying as under <u>Rule 34</u> the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]"

23. As of October 30, 2020, Supreme had received no useable information from Plaintiffs regarding the prequalified borrowers at issue.

24. On December 23, 2020, Supreme served its First Set of Interrogatories and First Request for Production of Documents on Plaintiffs. Supreme's Requests were directed towards the specific allegations in Plaintiffs' voluminous Amended Complaint, and in particular to allegations relating to alleged "Wrongdoing" (a defined term including all conduct by Defendants for which Plaintiffs sought relief), documents and information that was deleted, modified or taken, identifying "misappropriated clients" referred to in Plaintiffs' Initial Disclosures, and seeking information relevant to Plaintiffs' damage claims.

25. Plaintiffs failed to respond to Supreme's discovery requests in any fashion until January 7, 2022, when tjeu provided written responses and an initial document production. On January 7, Plaintiffs finally identified 110 borrowers (139 names including co-borrowers) whose business had been allegedly lost or diminished because of Wrongdoing. Supreme believes these to be the (110) "misappropriated clients" referred to in Plaintiffs' Initial

Disclosures. However, as reflected in Supreme's Deficiency Chart, Ex.9, Plaintiffs' discovery responses and document production failed to:

- provide a computation of damages with respect to any or all of the misappropriated clients, Deficiency Chart, nos. 1-2;

- identify communications or documents that concerned alleged Wrongdoing, *Id.*, nos. 3, 5, and 10;

- identify documents that were taken, modified, or deleted, *Id.*, no. 4;

- provide financial or other documents supporting Plaintiffs' damage claims, *Id.*, nos., 7, 8, 9, and 16;

- provide Plaintiffs' communications with misappropriated clients during the time period of the alleged Wrongdoing, which is relevant to causation and mitigation of damages, *Id.*, no. 12;

- identify the misappropriated clients that had been prequalified by Plaintiffs and produce documents reflecting prequalification, *Id.*, nos. 13 and 14; and

- answer the interrogatories under oath, *Id.*, nos. 2, 11, 12, 13, and 14.

26. As noted in Ex. 9, nos. 3-5, 8-10, and 15, Plaintiffs have failed to specify responsive documents to 20 of Supreme's requests, instead referring Supreme to thousands of pages of documents and, in most cases, referring Supreme to Plaintiffs' entire 50,000-page initial production.

27. Plaintiffs failed to provide a "computation of damages" on October 30, 2020, when they served their Initial Disclosures. This failure has continued unabated for more than 20 months during the pendency of this litigation.

28. Nor did Plaintiffs provide any meaningful information in response to Supreme's discovery requests, served on December 23, 2020. The Premium "financial statements" produced by Plaintiffs in support of their damage claims have 113 of 115 lines redacted. *See* **Exhibit 12**. Plaintiffs' failure is continuing, and it has prejudiced Supreme in

evaluating the amount of any exposure to liability and in fashioning specific discovery requests to explore damage claims.

29. At this point in time, Supreme does not even have a starting point to evaluate or inquire into Plaintiffs' damage claims.

30. Plaintiffs have also failed to identify documents they claim were deleted or altered, or produce the documents, information and data alleged to have been taken, stolen or converted. Plaintiffs have produced two spreadsheets, **Exhibit 13**, attached, which appear to list documents where information may have been deleted, altered or copied, but have failed to produce the documents described in the spreadsheets.

31. Plaintiffs have also failed to provide information concerning whether, and when deleted information was obtainable or obtained from other sources, or restored to its original form.

32. Finally, Plaintiffs have failed to identify and produce evidence of prequalification by Premium of borrowers who were allegedly diverted to Supreme.

33. My colleagues and I have made good faith efforts to obtain Plaintiffs' cooperation in providing the requested discovery, including in writing on December 10, 2021 [Doc. 69-12, pp. 18-19], January 27, 2022, February 25, 2022 (letter to the Court), and March 17, 2022 [attached as **Exhibit 14**], in conferences with counsel, and in Court conferences. These efforts, even with Court assistance, have failed to result in Plaintiffs remedying these long-standing deficiencies.

34. For the reasons set forth in Exhibit 9, and in Supreme's Memorandum of Law, these documents and information are clearly relevant to Plaintiffs' claims and Supreme's defenses, and should be produced.

## II.   SUPREME'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

35.   Plaintiffs' motion to compel, their third such filing since November 19, 2021, should be denied as meritless and unnecessary.

36.   Plaintiffs seek to rewrite a procedural history of this dispute by omitting important facts. These facts include great lengths of time that Plaintiffs themselves did nothing to move this case forward and Plaintiffs' long-standing discovery failures which have contributed to the time necessary for Supreme to search for and produce responsive documents.

37.   Also omitted is the fact that Plaintiffs' production of documents was conducted in the same fashion as Supreme, yet Plaintiffs insist on Court intervention to address Supreme's alleged "document dumps."

38.   Supreme incorporates by reference each of the three Charts addressing the specific deficiencies alleged by Plaintiffs, with respect to Interrogatories, **Exhibit 15**, Request for Production of Documents, **Exhibit 16**, and other alleged discovery failures, **Exhibit 17**. These Charts accurately report Plaintiffs' requests and Supreme's responses. For the reasons stated in **Exhibits 15-17** and Supreme's Memorandum of Law, Plaintiffs' motion must be denied.

39.   Plaintiffs' tactics in bringing these serial motions appear to be calculated. Plaintiffs filed their first motion on November 19, 2021 without any prior notice to Supreme.

40. As of November 19, I had heard nothing from Plaintiffs' counsel for more than three months. Supreme nevertheless understood its obligations under the Amended Scheduling Order of August 17, 2021.

41. Plaintiffs had requested the Amended Scheduling Order in August, correctly informing the Court that the amendment was required because the parties had made additional, unsuccessful efforts to settle the case in 2021 (after the failed mediation in 2020). [Doc. 34, Letter from M. Bass to Court.]

42. My firm had, before and after the issuance of the August 2021 scheduling order, drafted discovery responses, engaged an ESI vendor, communicated with in-house counsel about production, gathered potentially responsive documents and reviewed them for production.

43. When Plaintiffs filed their surprise motion to compel on Friday, November 19, 2021 at 5:43 pm [Doc. 37], I had sent drafts of the very discovery responses at issue to Supreme for review one-half hour *prior*.

44. Our records reflect that between August and November, 2021, Supreme's attorneys, paralegals and ESI vendor had spent more than 200 hours working on this matter, nearly all of it on collecting, reviewing, and preparing to produce potentially responsive documents, and preparing written discovery responses.

45. Supreme wrote to the Court on November 24, 2021 advising that the motion was improper, and advising that Plaintiffs had refused to stipulate to a date when their own long-outstanding discovery responses would be served. [Doc. 69-12, pp. 2-5].

46. Supreme served its first production of 732 pages on November 24, 2021 and its written responses on December 3, 2021, along with its second document production

consisting of 5200 pages of documents. These document productions included the results from searches for Supreme's records for "Misappropriated Clients" that had been referenced, but not identified, in Plaintiffs' Initial Disclosures.

47. Since Plaintiffs had not yet identified a single Misappropriated Client, the search and production consisted of was based on information available to Supreme.

48. A complete list of the documents produced to Plaintiffs, the dates of production, and the bates numbers, is attached as **Exhibit 18**.

49. On December 10, 2021, Supreme's counsel wrote to Plaintiffs' counsel and advised that the refusal of identify the customers and confidential information at issue was problematic, and demanded that Plaintiffs also respond to Supreme's discovery requests "and, in particular, identify Plaintiffs' lost customers, lost confidential information, and resulting damages." [Doc. 69-12, p. 19].

50. In the meantime, as a result of Plaintiffs' continuing demands and threats of a second motion to compel, Supreme ran searches on the borrowers identified by Plaintiffs at the mediation in September, 2020, in addition to other searches relating to the recruitment and onboarding of the Individual Defendants and the opening of Supreme's Williamsville office.

51. The initial results of this expanded borrower search were produced on January 7, 2022. Supreme's January 7 production consisted of 6300 additional documents.

52. On January 7, 2022, Plaintiffs identified 110 Misappropriated Clients for the first time, which included 139 names in its unverified response to Supreme's interrogatories (no. 5). Once Plaintiffs' interrogatory responses were received, Supreme's search was

expanded to include any of the 110 borrowers and 139 names that had not previously been searched.

53. In the meantime, Plaintiffs vehemently insisted both in writing to Supreme and to the Court that Supreme's search must be expanded further. On January 21, 2022, Plaintiffs' counsel wrote that "[t]he universe of relevant documents and information cannot be limited based on what Premium's systems, which the Individual Defendants tampered with, show." [Doc. 69-12, p. 34, first full paragraph] This position was repeated in Court by Plaintiffs' counsel on February 9, 2022 [Ex. 19, Tr. 34:3-9] and on February 25, 2022 [Ex. 20, Tr. 73:4-8].

54. At the same time, Plaintiffs failed to disclose what documents were "tampered with," and whether it resulted in the loss of all customer information in Premium's records, or only e-mail addresses and phone numbers. *See e.g.,* Amended Complaint, Doc. 15, ¶ 45.

55. Plaintiffs' January 7, 2022 document production purported to include documents which related to the Misappropriated Clients. Plaintiffs categorized 43,000 pages of their production as "borrower documents" without further delineation which we understand to relate to the Misappropriated Clients. Yet, Plaintiffs apparently don't consider this kind of production problematic when they are the ones producing the documents.

56. On January 7, Plaintiffs also produced 240 pages of "responsive credit pulls" which Supreme understands to include all credit reports obtained by Premium for the Misappropriated Clients.

57. Obtaining a credit inquiry is the first step in the prequalification process. If a credit inquiry was not made for a borrower prior to the Individual Defendants last date at

Premium (April 25, 2019), that borrower is almost certainly not a Misappropriated Client of Premium.

58. At the conference on February 9, 2022 the issue of the "shelf life" of any information taken from Premium was discussed. [Ex. 19, 23:20–24:10]. Plaintiffs' counsel told the Court that loans typically close within 60 to 90 days in Upstate New York, and that any new loans appearing in Supreme's "pipeline reports" within 30 days after the Individual Defendants had been hired by Supreme "probably originated at Premium because it just doesn't move that fast." [Ex. 19, 14:23–15:3].

59. At the conference, Supreme agreed to search all borrowers listed in its "pipeline" reports where any Individual Defendant was a loan officer or originator, for the first five weeks of their employment at Supreme (or through May 31, 2019). [Ex. 19, 24:2-18]. These borrowers would be searched whether or not Plaintiffs had a record of credit being pulled by Premium. *Id*. Supreme conducted this search as promised, and produced responsive documents beginning March 18, 2022.

60. Supreme searched its records for any borrower included in Premium's production of "credit pulls." Of the names included in Premium's production, Supreme has a record of a total of 47 borrowers. Of those borrowers, 23 closed loans after April 25, 2019 with Supreme where any of the Individual Defendants were the originator or loan officer.[1] The total loan amounts for these 23 borrowers was $3,665,095.[2] The modest number of

---

[1] An additional 19 loans of borrowers who appear to have been prequalified at Premium were closed by Supreme. For these loans, non-party Jackie Ruotsi was the originator or loan officer. No allegations are made in the Amended Complaint alleging wrongdoing by Ruotsi. Nevertheless, Supreme searched its files and made an initial document production relating to these additional borrowers on March 18, 2022, along with an initial production for all other Misappropriated Clients identified by Plaintiffs on January 7, 2022.

[2] As discussed above, Plaintiffs have not provided a computation of damages. The evidence provided to date by Plaintiffs suggests that they believe their damages can be measured by multiplying the total loan value by

Misappropriated Clients who were actually prequalified at Premium was discussed in Court on February 9. [Ex. 19, 21:16-22:9].

61.     Supreme's search for the 110 Misappropriated Clients identified by Plaintiffs on January 7 resulted in a massive amount of data being subject to review, privilege check, deduplication, and production. Supreme conducted the search despite the fact that for at least 63 of the 110 Misappropriated Clients, Premium had no record of having conducted a credit inquiry (i.e. – they were not prequalified).

62.     Supreme reported to the Court on February 9, that its searches were "over inclusive" and would likely result in the production of documents relating to borrowers "that have no connection whatsoever" to Premium. [Ex. 19, 28:2-17].

63.     Plaintiff's counsel responded that "what Mr. Cole is trying to do is to limit our ability to be able to ascertain the extent of the theft by defining what the relevant universe is." [Ex. 19, 34:5-8]. Later at the same conference, Plaintiffs' counsel stated, "I know Mr. Cole has spent all of discovery trying to limit the universe of documents that [. . . ] are discoverable in this case." [Ex. 19, 63:10-12].

64.     At the February 25 conference, Plaintiffs' counsel again criticized the scope of Supreme's searches: "Its full discovery according to Mr. Cole, because he invents what is relevant versus what we have requested. So, for example, he has limited the documents he has disclosed to, initially, to Premium showing that they had information about this person before, despite the fact that the computers were admittedly tampered with." [Ex. 20, 73:5-11]. "Mr. Cole has tried to limit our access, as much as he can, whenever he can." [Ex. 20, 101:14-16].

---

1.5% [Doc. 15-5, pp. 3, 21, and 39 – where Premium demands 1.5% as compensation for lost loans]. If so, the total damages sustained by Plaintiffs would be $55,000.

65. Despite the fact that the "shelf-life" of any information taken by the Individual Defendants is likely 60-90 days because of the nature of the business, Plaintiffs have insisted and continue to insist that Supreme review records for 2020, 2021 and 2022, and provide Plaintiffs with complete information for all borrowers closing loans with Supreme.

66. Supreme has already searched for and produced records for 176 borrowers that were not prequalified at Premium, and indeed appear to have no connection with Premium whatsoever. This has resulted in the production of tens of thousands of pages of loan-related documents that have nothing to do with Plaintiffs' claims. The production of documents relating to the list of Misappropriated provided by Plaintiffs on January 7, was largely completed by March 18, 2022. However, the searches of additional borrowers requested by Plaintiffs took additional time and effort. Moreover, Plaintiffs' insistence that Supreme collect, search, review, and produce documents relating to 176 borrowers that had no apparent connection to Premium resulted in delays that impacted all facets of Supreme's production.

67. As a result of Plaintiffs' insistence at Court conferences on February 9 and February 25, 2022, Supreme agreed to expand its borrower search to include all borrowers whose name appeared in Supreme's "pipeline" reports through May 31, 2019, and all borrowers whose loans were closed at the Williamsville branch of Supreme at any time in 2019. The total number of borrower names Supreme search ultimately ballooned to 223, or 255 names if joint borrowers are included. Supreme decided that the better course was to avoid conflict and more Court conferences, if possible, and conduct searches, reviews, and productions for nearly five (5) times as many borrower names as had been prequalified at Premium (223 vs. 47).

68. Put another way, Supreme conducted searches for 176 borrowers (more if joint borrowers are included) that were <u>not</u> prequalified at Premium. Many of these borrowers had no connection at all to Premium, but just happened to close loans with Supreme at some time in 2019 or 2020.

69. Supreme's counsel identified to the Court on February 9 and 25 the plan for the finalization of its production. This included a commitment to complete the production of the borrower documents for the 223 borrower names, search text messages, provide commissions reports for 2019, provide and LARS reports. The additional searches, review, production, and compilation of privilege log was accomplished in stages.

70. On March 18 and March 25, 2022, Supreme produced 18669 pages of additional documents, consisting in substantial part of additional documents responsive to searches of borrower names. Supreme also provided an updated bates log. The transmittal letters and enclosures for Supreme's March, April, and May 2022 productions are attached as **Exhibit 21**.

71. The production of borrower documents from Supreme's expanded search was substantially completed on April 20, 2022, when an additional 41,000 pages of documents were produced. With the transmittal of additional documents on April 20, 2022, Supreme provided Plaintiffs with an updated bates-log of documents (as it had with prior productions) and a list of the borrower names that had been searched to date. The names have been partially redacted in this filing, but were provided in the communication with Plaintiffs' counsel.

72. Through present, Supreme has produced 28,141 documents consisting of 80,000 pages, comprising 15.7 gigabytes of data. A large portion of this production likely relates to borrowers who have no connection with Premium.

73. On May 25, 2022, Supreme delivered to Plaintiffs its final document production, amended interrogatory responses, its privilege log, and its updated bates log. The production included roughly 7600 pages consisting of additional text messages, personnel files of non-parties, 2020 loan closings by Supreme of borrowers who may have been prequalified by Premium, and additional documents including documents that had been previously flagged for further review because of possible privilege issues.

74. As set forth herein and as reflected in Exhibits 15, 16, and 17, Supreme has complied in good faith with its discovery obligations.

75. Supreme has identified the source of documents in its productions, provided an itemization of the documents it has produced, and has not provided "document dumps" in response to discovery requests. The volume of the documents being produced is directly related to the Plaintiffs' refusal to agree to any limits on the search inputs.

76. Contrary to Ms. Stiller's statements, I have never refused to engage in an ESI discussion. To my recollection, Ms. Stiller has not been a party to any of the meet and confer sessions held at any time in 2022 in this case.

77. Plaintiffs' motion is based in large part on innuendo, generalizations, and baseless attribution of bad motives to Supreme. The process of responding to Plaintiffs' endless demands and accusations has indeed been difficult, and in some cases slower than hoped, but Supreme has fulfilled its obligations and will continue to do so.

78. Moreover, Supreme has substantially done what it told the Court it would do at conferences on February 9 [Ex. 19, pp. 28, 49] and February 25, 2022 [Ex. 20, pp. 64-66, 68-72]. As discussed at the conferences, Supreme has provided a list of its 2019 Williamsville closings, provided LARS reports for 2019 and 2020, completed its search for documents relating to 223 borrowers (255 names) from various sources including the entire 2019 closing list, searched for and provided text messages, and provided a privilege log, among many other items.

79. Everything that has been provided to date by Supreme, including a final production on May 25, 2022, was already in process by February, 2022 and in most cases long before. Plaintiffs' motion should be denied as meritless.

### III. SUPREME'S MOTION TO MODIFY THE STIPULATED PROTECTIVE ORDER.

80. Supreme's request to modify the Stipulated Protective Order ("SPO") [Doc. 28] arises out of Supreme's intent, communicated to Plaintiffs in December 2021, to provide Supreme's profit and loss statements relating to the Williamsville branch.

81. Supreme had offered to provide these statements in its December 2, 2021 written responses to Plaintiffs' discovery requests, provides Plaintiffs agreed to modify the SPO to allow an "Attorneys' Eyes Only" or "AEO" designation.

82. Plaintiffs have not agreed to the proposed modification of the SPO.

83. Supreme now moves to modify the SPO in the manner proposed to Plaintiffs on December 14, 2021, [**Exhibit 22**], by having the Court amend paragraphs 3 and 4 to state that a party may designate documents or testimony as attorney's eyes only (AEO) if such documents or testimony is of such a private, sensitive, competitive or proprietary nature that present disclosure to person, other than those designated in paragraph 5(b)(2)-(9) of the SPO

would reasonably be expected to cause irreparable harm or materially impair the legitimate competitive position or interests of the producing party.

84. Paragraph 15 of the SPO provides that the Order shall be subject to modification by the Court on its own initiative or on motion of a party or any other person with standing concerning the subject matter.

85. As the Court is aware, Premium and Supreme are competitors in the marketplace. Plaintiffs have tried, unsuccessfully, to modify the SPO to provide regulators with access to confidential material disclosed by Supreme in this litigation.

86. Supreme understandably considers it necessary to protect confidential financial information that would be valuable to Premium in competing, and does not want to rely solely on Premium's interpretation of its obligations not to use Supreme's confidential financial information for competitive purposes.

87. Premium obviously feels the same way, as it has redacted almost every piece of information on the financial statements provided to Supreme. Essentially, Premium's solution is to not provide the information at all.

88. Supreme therefore requests that this Court modify the SPO so that an AEO designation with permit both sides to exchange the requested discovery while also protecting sensitive financial information.

I declare under penalties of perjury that the foregoing is true and correct.

Dated: May 30, 2022  
Rochester, New York

/s/ *Steven E. Cole*  
Steven E. Cole