# EXHIBIT 19

1           UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - X
    MICHAEL DONOGHUE and PREMIUM)    20CV6100
4   MORTGAGE CORPORATION,
                    Plaintiffs )
5   vs.                            Rochester, New York
    CYNTHIA NOSTRO, DYLAN RANDALL,
6   DAVID POPHAM and EVERETT
    FINANCIAL, INC d/b/a SUPREME
7   LENDING                    )    February 9, 2022
                                       3:00 p.m.
8   - - - - - - - - - - - - - X
    **CASE MANAGEMENT CONFERENCE**
9   **TRANSCRIBED FROM AN ELECTRONIC RECORDING DEVICE**

10           TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE MARK W. PEDERSEN
11            UNITED STATES MAGISTRATE JUDGE

12
    SHARON P. STILLER, ESQ.
13  MAUREEN BASS, ESQ.
    ALEX FANTAUZZO, ESQ.
14  Abrams, Fensterman, LLP
    Ferrara & Wolf, LLP
15  160 Linden Oaks, Suite E
    Rochester, New York 14625
16  (Appearing on behalf of the Plaintiff)

17  ANNA S.M. MCCARTHY, ESQ.
    JEFFREY J. CALABRESE, ESQ.
18  Harter Secrest and Emery, LLP
    50 Fountain Plaza, Suite 1000
19  Rochester, New York 14604
    (Appearing on behalf of Defendants Nostro, Randall &
20  Popham)

21  STEVEN E. COLE, ESQ.
    Adams Leclair LLP
22  28 East Main Street, Suite 1500
    Rochester, New York 14614
23  (Appearing on behalf of Defendant Everett Financial, Inc
    d/b/a/ Supreme Lending)

24

25  **COURT REPORTER: Karen J. Clark, Official Court Reporter**
                **Karenclark1013@AOL.com**

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

10:49:53  2    of that report, we could tell every borrower that was

10:50:03  3    closed by a former Premium employee who went over to

10:50:11  4    Supreme, and then we would at least have the ability to

10:50:13  5    search our documents and search our computers to see if

10:50:17  6    those individual borrowers were a point of contact with

10:50:20  7    our company as opposed to the Supreme company.

10:50:23  8          MAGISTRATE JUDGE PEDERSEN:  Wouldn't that

10:50:24  9    information have been scrubbed by your allegation that

10:50:28  10   the defendants erased it before they left so you

10:50:31  11   couldn't tell.

10:50:32  12         MS. BASS:  It might be.  It might be, Your

10:50:35  13   Honor, but some of it might also be there.

10:50:37  14         MAGISTRATE JUDGE PEDERSEN:  So let's say he

10:50:40  15   reveals a person and a commission, and it's one of your

10:50:42  16   people, and it fits the criteria that you think is the

10:50:45  17   stolen information.  How are you going to tell if it's

10:50:48  18   the right client?

10:50:48  19         MS. BASS:  So the hope is that some of

10:50:50  20   this -- there would be artifacts in our system that

10:50:53  21   those individuals were introduced to Premium while the

10:50:57  22   employees was still there.  There's also a temporal

10:51:00  23   issue here, Your Honor.  Loans with expected close in

10:51:03  24   upstate New York of between 60 to 90 days.  But if a

10:51:05  25   former Premium loan officer closed a loan at Supreme 30

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

10:51:09  2     days in, it probably originated at Premium because it

10:51:13  3     just doesn't move that fast.

10:51:14  4          So we suspect that they'll at least -- at

10:51:17  5     least we'll have a better opportunity to wrap our arms

10:51:20  6     around it.  To the extent that there is a, you know,

10:51:22  7     what I would refer to as a clean Supreme client, has no

10:51:26  8     contact with Premium, again, that individual is going to

10:51:31  9     be protected by the confidential designation that these

10:51:35  10    documents had come to us.

10:51:37  11         So this is -- this is the path of least

10:51:42  12    resistance.  It's not a nuance discovery issue.  This is

10:51:45  13    the path of least resistance for us to try to wrap

10:51:49  14    our -- everyone's arms around the universe.  Because

10:51:52  15    with respect to Supreme, I'm not even sure that they

10:51:55  16    know what information the individual loan officers took

10:51:59  17    from Premium when they left.

10:52:01  18         MAGISTRATE JUDGE PEDERSEN:  So let's say

10:52:02  19    that you find somebody who went from your firm to his

10:52:05  20    firm, closed the loan within 25 days of coming into the

10:52:10  21    new firm, that's a suspicious transaction?

10:52:12  22         MS. BASS:  Yes, your Honor.

10:52:13  23         MAGISTRATE JUDGE PEDERSEN:  How do you

10:52:16  24    confirm whether your suspicions are right?

10:52:20  25         MS. BASS:  A number of ways.  The

1    M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

10:52:31    2    anticipation is some day in the near future we'll be

10:52:37    3    able to sit down across from the loan officers who left

10:52:44    4    Premium, and we'll be able to ask those questions.  For

10:52:48    5    example, if the borrower's name is Bob Smith, how did

10:52:51    6    Bob Smith become your client?  How did Bob Smith become

10:52:55    7    a customer?  And we also anticipated doing some notices

10:53:00    8    to admit to the individual defendants.

10:53:06    9         So we have some thoughts on how to get that

10:53:09   10    done, but it's really the only way to get it done.

10:53:12   11    Mr. Cole in his defense yesterday said, I'll give you

10:53:15   12    their W-2s, but their W-2s, while we appreciate -- we

10:53:21   13    appreciate that offer, the W-2s don't help us because it

10:53:26   14    doesn't identify the borrowers.

10:53:30   15         And it's not just commissioned reports.  The

10:53:39   16    easiest -- the path of least resistance here -- and

10:53:41   17    again, because we've got the confidential designations,

10:54:09   18    and we knew borrower information was going to be

10:54:14   19    exchanged, it's just for Supreme to tell us the loans

10:54:19   20    that they closed at least within a certain timeframe of

10:54:23   21    our officers leaving our company and going to their

10:54:26   22    employ.

10:54:26   23         And, again, if they -- if they're not -- if

10:54:29   24    there's a reason for them to be excluded from Premium's

10:54:33   25    account damage calculation, that's something that the

1       M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

10:54:35    2   folks can fight about at a later time.  But right now,

10:54:39    3   we need to get our arms around the universe of what's

10:54:44    4   out there, what's missing, what was closed.  We don't

10:54:47    5   have any control of that information.  Supreme is the

10:54:51    6   only entity with full control of that information,

10:54:54    7   Supreme and the individuals.

10:54:55    8           And, again, it's the cart before the horse.

10:54:58    9   We'd love to be able to give Mr. Cole a list and say

10:55:01   10   these are the 100 documents, the 100 individuals from

10:55:10   11   our system that we've identified.  We just can't do

10:55:13   12   that.  So we have to take Mr. Cole's list, we have to

10:55:16   13   take Supreme's list, we have to take Supreme's

10:55:19   14   commission list, and we have to go through them and try

10:55:22   15   to reverse engineer whether those folks were introduced

10:55:28   16   through Premium or whether those are actual Supreme

10:55:49   17   customers that came over after they left.

10:55:52   18           MS. STILLER:  And if I could just add a

10:55:55   19   couple of minor points to that.  I don't have major

10:55:59   20   points, but the Williamsville office was opened with

10:56:03   21   these originators.  So it's not like it's mix and match.

10:56:08   22   They -- they opened the office, so there's a finite --

10:56:09   23           MAGISTRATE JUDGE PEDERSEN:  The only people

10:56:12   24   in the Williamsville office are people who came from

10:56:19   25   Premium?

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

14:29:11   2   their credit report.  That's the very first thing that

14:29:14   3   happens.  Then there's a loan application.  Then there's

14:29:17   4   a whole bunch of things that go on in order -- you know,

14:29:19   5   in order to close the sale itself that the mortgage

14:29:23   6   company isn't necessarily directly involved in.

14:29:26   7          And then there's the closing with the

14:29:28   8   promissory note.  Then you have the lending relationship

14:29:31   9   and the compensation that comes with it.  So the very

14:29:34   10  first step in the process is you -- you run a credit

14:29:36   11  report on somebody because otherwise they are not a

14:29:39   12  legitimate prospect.

14:29:39   13         MAGISTRATE JUDGE PEDERSEN:  Okay.

14:29:41   14         Mr. Cole:  And sometimes the credit score

14:29:44   15  itself is going to mean they're not.  But that's the

14:29:47   16  very first thing.  We've asked Premium to tell us all of

14:29:50   17  the -- all of the individuals where a credit report was

14:29:53   18  requested within, you know, the time period before the

14:29:57   19  individual defendants left.  And they've provided us

14:30:02   20  with 53 names.  Okay?  Ultimately, that's 53.

14:30:06   21         We believe from what we can tell right now,

14:30:08   22  and it could be that they find more or something, that

14:30:12   23  there were 29 loans that closed with respect to those 53

14:30:16   24  individuals where there was a prior credit pull.  The

14:30:19   25  total loan value of the -- of all those loans together

1    M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

14:30:23    2    is about $4.5 million.  Okay?  That's the loan.  And

14:30:29    3    what Ms. Stiller requested compensation from Premium for

14:30:32    4    each loan was 1.5 percent of those loans.  Okay?

14:30:36    5    So, based on what we know right now, this is

14:30:40    6    about a $60,000 case, maybe a $70,000 case in terms

14:30:45    7    of -- it may get more.  Maybe -- maybe they can prove

14:30:46    8    more, but that's what it looks like to us right now that

14:30:49    9    we're spending all this time on.

14:30:51    10    Let's get -- but let me just get to the

14:30:52    11    point.  I'm not, as a precondition, requiring that they

14:30:57    12    provide proof of a relationship between Premium and

14:31:02    13    any -- and any Supreme customer as a precondition to

14:31:06    14    discovery, at least not -- not standing alone.  Because

14:31:10    15    we're also doing searches outside of those 53, which

14:31:14    16    we're doing right now, and some of which, many of which

14:31:17    17    we've already produced.  We're also searching all of

14:31:24    18    the -- all of the pipeline documents.

14:31:25    19    So, let me just insert another -- another

14:31:29    20    piece of terminology in here.

14:31:31    21    MAGISTRATE JUDGE PEDERSEN:  So after we're

14:31:32    22    done, I'll be able to get a job at Premium or Supreme?

14:31:36    23    Mr. Cole:  Yeah.  Right.  Well, what I

14:31:37    24    really want to have the Court understand is that we are

14:31:40    25    searching for the same universe of -- of potential

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

14:31:44   2   customers as Premium is, and we're -- we're -- as we

14:31:47   3   understand more, we're searching more.

14:31:49   4          But there is -- in terms of -- they want

14:31:52   5   commission reports for the individual defendants.  We

14:31:55   6   talked about that yesterday, and I did not say no to --

14:31:59   7   to Ms. Bass on that.  I said let me check with the

14:32:01   8   client, and I will -- I will check with the client.  We

14:32:04   9   are providing -- we are providing payroll reports

14:32:08   10  anyway, but I am going to check on the commissions.

14:32:10   11         But we've already --

14:32:10   12         MAGISTRATE JUDGE PEDERSEN:  Would payroll

14:32:12   13  reports include commissions?

14:32:14   14         Mr. Cole:  They -- they would basically be

14:32:16   15  like their pay stubs, Judge.

14:32:16   16         MAGISTRATE JUDGE PEDERSEN:  Okay.

14:32:18   17         Mr. Cole:  And until I see them, I can't --

14:32:20   18  I can't say whether or not they -- they line up.  I

14:32:22   19  understand what they want.  They want to line up

14:32:24   20  particular loans and compensation.  But here's -- here's

14:32:26   21  the point, there is -- there is this window of relevancy

14:32:30   22  because whatever they took, if they took anything, to

14:32:35   23  Supreme it has a limited --

14:32:36   24         MAGISTRATE JUDGE PEDERSEN:  Shelf life.

14:32:38   25  Sure.

M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

14:32:38   Mr. Cole:  -- timeline; right?  We're

14:32:39 talking about 30 to 60 days realistically.  We're taking

14:32:44 all of the Supreme pipeline reports where they had --

14:32:47 where they had potential loans that were going to close

14:32:49 in the first five weeks that they were there.  And every

14:32:52 single -- every single borrower that appear as being for

14:33:00 Popham, Randall or Nostro in Supreme's pipeline, we're

14:33:20 going to search it, and we're going to provide whatever

14:33:23 is there with respect to those.  And that's actually

14:33:26 better --

14:33:26   MAGISTRATE JUDGE PEDERSEN:  Five weeks?

14:33:27   Mr. Cole:  For the first -- for the first

14:33:28 five weeks on top of all -- and these are without any

14:33:30 reference to anything over at Premium, whether or not

14:33:33 they had credit pulls on them or not.  We're -- we're

14:33:36 going to do the search, and we're going to -- we're

14:33:38 going to produce it; okay?  If there are other documents

14:33:42 that you heard that the plaintiffs have not even

14:33:46 reviewed the paper documentation that the individual

14:33:48 defendants produced back in November, okay, we've gone

14:33:54 through that, and we are going to search any of those.

14:33:56 And if anything comes up on Supreme on those -- so

14:34:01 that's 60 additional files we're going to -- we'll

14:34:03 produce that as well.  We'll produce any -- any --

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

14:34:05   2    anything in Supreme.

14:34:06   3          MAGISTRATE JUDGE PEDERSEN:  You've already

14:34:07   4    produced those files.

14:34:07   5          Mr. Cole:  What's that?

14:34:08   6          MAGISTRATE JUDGE PEDERSEN:  What do you mean

14:34:09   7    you're going to search them and produce them?  You're

14:34:14   8    already producing them now; aren't you?

14:34:14   9          Mr. Cole:  We're going to search Supreme's

14:34:26   10   records.  Those are the individual defendants' paper

14:34:28   11   files.

14:34:28   12         MAGISTRATE JUDGE PEDERSEN:  Okay.  Those

14:34:29   13   paper files are potential client files?

14:34:32   14         Mr. Cole:  They -- apparently they're --

14:34:35   15   they were perhaps borrowers or potential borrowers.  You

14:34:40   16   know, some go back quite a ways, I think, at Premium.

14:34:43   17   So I -- but we're -- it doesn't matter.  We're just

14:34:45   18   going to search it.  Because that is -- we think between

14:34:48   19   the credit pulls, the pipeline reports of the first five

14:34:51   20   weeks that they're at Supreme, and these -- these

14:34:54   21   potential borrowers, wherever they came from, once we

14:34:58   22   search all of those things, we're -- we're going to

14:35:00   23   provide all the e-mails that mention those and any of

14:35:03   24   those borrowers, which we already have.

14:35:06   25         I mean, they already have a bunch of the

1        M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

14:35:08    2    pipeline reports, including a bunch from April and May

14:35:11    3    of 2019.  And we're going to produce the credit pull at

14:35:16    4    Supreme, the loan application at Supreme, and the

14:35:18    5    promissory note at Supreme, so they can see whether or

14:35:22    6    not there was actually a loan that was ever funded.

14:35:25    7            And between those -- that universe of

14:35:27    8    documents, it's my belief that we're going to capture --

14:35:31    9    we're going to over include by quite a few any possible,

14:35:35   10    any possible borrowers that came over.

14:35:38   11            But let me just -- let me just address

14:35:40   12    something that's important as well.  Because what --

14:35:43   13    what Premium has come in and said is that, well, the

14:35:46   14    individual defendants deleted some files, and we don't

14:35:50   15    know, we don't know.  But they did know.  They did know;

14:35:52   16    right?  They did know some -- at least some of these

14:35:56   17    borrowers.  Okay, we -- if you're going to allege that

14:35:58   18    there was some reason that Supreme owes money on a

14:36:01   19    borrower that was allegedly taken -- information was

14:36:06   20    taken from Premium and brought over to Supreme, we --

14:36:09   21    we're entitled to know in discovery what Premium knew

14:36:13   22    and when they knew it.

14:36:15   23            They say the documents -- they say the

14:36:16   24    documents were deleted.  All right, what documents?

14:36:18   25    They say that -- you know, were those documents -- were

```
                    M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.
14:36:22    2   those documents recovered?  We don't -- we don't have
14:36:24    3   any of that stuff.  Our -- our production from Premium
14:36:29    4   is miniscule as it relates to documents other than
14:36:33    5   e-mails.  And I'm not -- I don't want to go into all of
14:36:36    6   it because I think Ms. Bass and I still have some more
14:36:40    7   talking to do about that, and I don't want to -- I don't
14:36:43    8   really want to get the Court involved until it's
14:36:46    9   absolutely necessary.
14:36:47   10           But we have questions about the way their
14:36:50   11   electronic documents and e-mails were produced, because
14:36:53   12   there were many, many documents that were not produced
14:36:56   13   that were attached to e-mails, and we're working through
14:37:01   14   why that was.  And I think, hopefully, we can come to
14:37:03   15   some combination on it.
14:37:03   16           But this is a -- this is a give and take
14:37:09   17   thing, Judge.  I know you hear that we've been here
14:37:23   18   because the plaintiffs have requested your consideration
14:37:25   19   of their issues up to now.  But they're not the only
14:37:28   20   issues out there.  And -- and Supreme intends to
14:37:31   21   continue to cooperate in discovery, reasonably
14:37:36   22   cooperate, and -- but we'll have our own issues as well.
14:41:11   23           MAGISTRATE JUDGE PEDERSEN:  So I'm curious,
14:41:18   24   what is the plaintiff asking for that Supreme would
14:41:24   25   prefer not to produce?
```

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

14:41:29  2          Mr. Cole:  It's -- there really is not a

14:41:31  3  lot, except for we've already produced -- we're already

14:41:34  4  overinclusive in our production of e-mails and other

14:41:37  5  documents relating to borrowers that have no connection

14:41:42  6  that we can see whatsoever to -- to Premium.  And we

14:41:47  7  just don't want to go beyond that.  We think we've --

14:41:50  8  we've already produced documents, many documents we

14:41:54  9  believe that come from a list that was provided to us in

14:41:58  10  mediation because we had to provide our discovery before

14:42:02  11  Premium produced their discovery.  And as far as we can

14:42:06  12  tell, many of those borrowers in the mediation list had

14:42:10  13  no credit pulls, no connection to Premium and therefore,

14:42:14  14  there's a lot of -- there's a lot of documents that have

14:42:19  15  already been produced under a confidentiality

14:42:30  16  designation that we don't think has any connection with

14:42:33  17  this case at all.

14:42:34  18        So, we want -- first of all, we want to be

14:42:37  19  efficient because we've already gone back a few times,

14:42:40  20  and we want to -- we just want to make sure there's an

14:42:42  21  understanding of what we're going to go back and search

14:42:45  22  and produce.  And we don't want to be accused of doing

14:42:48  23  things that we haven't done.  We want to be complete,

14:42:51  24  and we don't want to go over things over and over again

14:42:54  25  because there's an allegation that somebody destroyed a

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:03:39   2   and to me, it would have resolved some of the issues

15:03:42   3   with respect to what Premium's reporting obligation is

15:03:46   4   because I can't imagine that anybody could take the

15:03:49   5   position that we can't take documents that were

15:03:52   6   improperly taken from us and use those to meet our

15:03:57   7   reporting obligation.

15:03:58   8          But be that as it may, it's my understanding

15:04:03   9   that -- that the individual defendants had indicated

15:04:06   10  that there are some other documents that can be

15:04:09   11  examined.  We tried to set up a time to examine them.

15:04:13   12  We still have not seen what's in the banker's box.  But

15:04:17   13  for Mr. Cole to say, you know, this is -- this is what I

15:04:21   14  think is relevant and to use the May 2nd letter to try

15:04:26   15  to allege what damages are is disingenuous in the least,

15:04:32   16  whatever it is, it's a very disingenuous.

15:04:37   17          MAGISTRATE JUDGE PEDERSEN:  Ms. Bass, you're

15:04:38   18  saying that there are reports that Supreme is required

15:04:40   19  to file with regulatory agencies that you would like to

15:04:44   20  copy?

15:04:46   21          MS. BASS:  Yes.  Yes, Your Honor.  They're

15:04:53   22  called LARs.  It's Loan Application Reports.  So each --

15:04:54   23  each mortgage banker who practices in New York has to

15:04:57   24  complete these documents.  Some of the information on

15:04:59   25  the LARs is publically available.  So we're able to get

1      M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:05:03  2  some of the information.  But what's missing from the

15:05:06  3  LARs -- for example, we can download Supreme's LARs, but

15:05:10  4  what's missing from that is the borrower name and the

15:05:13  5  loan officer who originated the loan.

15:05:15  6          MAGISTRATE JUDGE PEDERSEN:  And that would

15:05:16  7  give you the information you need to figure out what, if

15:05:18  8  anything, you believe originated at Premium and was

15:05:22  9  taken over to Supreme?

15:05:23  10         MS. BASS:  That's correct, yes.  If we

15:05:27  11  had -- if we had essentially --

15:05:27  12         MAGISTRATE JUDGE PEDERSEN:  And for what

15:05:28  13  period of time are you looking for LARs?

15:05:32  14         MS. STILLER:  We -- until we received the

15:05:35  15  text messages, we did not know, and we still don't know,

15:05:39  16  the extent of what was taken.

15:05:42  17         MAGISTRATE JUDGE PEDERSEN:  Certainly, it's

15:05:43  18  not for five years.

15:05:44  19         MS. STILLER:  I'm sorry?

15:05:45  20         MAGISTRATE JUDGE PEDERSEN:  You're not

15:05:46  21  looking for five years?

15:05:47  22         MS. STILLER:  It hasn't been five years.  So

15:05:49  23  we're definitely looking through 2019 and 2020, and it

15:05:53  24  may be as far as 2021.  I don't know what they did with

15:05:58  25  the information.  We -- again, we have no -- somehow the

                    M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:06:03   2   pipeline -- names of Premium clients jumped from Premium

15:06:07   3   to a Supreme pipeline without there being any

15:06:11   4   documentation that we've seen.  And somehow there were

15:06:17   5   loans that were closed, including under a totally

15:06:22   6   different loan originator, that -- that some we can

15:06:30   7   match names, some we can't.  We have no information

15:06:33   8   about the genesis.

15:06:35   9           And to simply say -- you know, it's very

15:06:38   10  easy for --

15:06:40   11          MAGISTRATE JUDGE PEDERSEN:  Let me ask a

15:06:41   12  question.  If you had the LARs reports for 2019, knowing

15:06:44   13  that these people left Premium's employment on April

15:06:49   14  25th, 2019, if you had the LARs reports for all of 2019

15:06:54   15  that they've already produced to the regulatory agency,

15:06:57   16  that would contain the borrower's name, the seller's

15:07:00   17  name, if you will, the employee who sold that and the

15:07:03   18  date, that would be enough to let you know what's left

15:07:07   19  in your system to determine if you think the loan closed

15:07:12   20  from information taken from Premium?

15:07:15   21          MS. STILLER:  Not really, Your Honor,

15:07:16   22  because there's also some -- a prospective client list

15:07:24   23  and other information that was taken.  So if it's a loan

15:07:27   24  in progress --

15:07:27   25          MAGISTRATE JUDGE PEDERSEN:  If I took

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:07:28  2   information on a prospective client list and never

15:07:31  3   closed a loan with the prospective clients, even though

15:07:35  4   I tried to, would that amount to any damages?

15:07:38  5          MS. STILLER:  On our prospective, they took

15:07:40  6   our prospective client list and may have closed those

15:07:47  7   clients.

15:07:47  8          MAGISTRATE JUDGE PEDERSEN:  Right.  And you

15:07:47  9   would know -- oh, I see, you're looking for the

15:07:49  10  prospective client list as well.

15:07:51  11         MS. STILLER:  Well, we know -- we don't know

15:07:53  12  everyone who should have been on our prospective client

15:07:57  13  list.  We do know that they copied and admit that they

15:08:00  14  copied.

15:08:01  15         MAGISTRATE JUDGE PEDERSEN:  So those

15:08:02  16  prospective client lists might be within the banker's

15:08:06  17  box.  We don't know.

15:08:07  18         MS. STILLER:  We don't know.  We don't know

15:08:09  19  what's within the -- those documents.

15:08:11  20         MAGISTRATE JUDGE PEDERSEN:  So Mr. Cole and

15:08:12  21  Mr. Calabrese, these LARs reports, what would be the

15:08:16  22  drawback to giving them 2019's LARs reports that you

15:08:19  23  filed with a regulatory agency, especially since we've

15:08:23  24  got a confidentiality agreement?

15:08:30  25         Mr. Cole:  Judge, that's a really good

1        M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:08:33   2   question.  What -- what happens is that they're -- LARs

15:08:33   3   reports didn't even come up until yesterday.  That --

15:08:36   4   that is not a name that's been mentioned to me until

15:08:39   5   yesterday's conference, and even then, there wasn't a

15:08:42   6   request that we produce it.  So is it possible that that

15:08:46   7   is a -- a solution?  I guess it's possible.

15:08:46   8        MAGISTRATE JUDGE PEDERSEN:  It sounds like

15:08:47   9   it might be a shortcut.

15:08:49  10        Mr. Cole:  Well, it -- it might -- it might

15:08:50  11   be.  Here's what -- essentially, what counsel for -- for

15:08:54  12   the plaintiffs is arguing their case over and over again

15:08:57  13   and going over evidence that we produced, either the

15:09:01  14   individual defendants or Supreme has produced in

15:09:03  15   litigation, in order to hammer home points without ever

15:09:07  16   making a specific request for anything in terms of

15:09:10  17   additional discovery.

15:09:11  18        And what we -- literally, other than the

15:09:14  19   commission reports, which we discussed yesterday and was

15:09:17  20   not an issue that even I believe really requires Your

15:09:20  21   Honor's involvement at this point, because I haven't

15:09:24  22   said no; all right?  I'm going to go back.

15:09:27  23        And as far as this LARs report, honestly, I

15:09:31  24   don't have enough information because I haven't talked

15:09:33  25   to my client about the LARs report.  That's something

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:09:35  2     that if Ms. Bass had said to me yesterday or before,

15:09:39  3     hey, these LARs reports are getting -- we want them and

15:09:42  4     you should produce them, and I would have gone back to

15:09:45  5     my client.  What's the -- you know, are we going to

15:09:49  6     produce them?  What are they, first of all.  Because,

15:09:52  7     honestly, I haven't had that conversation.

15:09:54  8          But we'll be here, I'm sorry to say this, in

15:09:57  9     two weeks with more generalized complaints about what it

15:10:01  10    is that we have and haven't produced and the positions

15:10:04  11    we're taking when, honestly, all I'm trying to do is

15:10:08  12    accommodate the -- any kind of tie that Premium has to a

15:10:12  13    particular borrower, and -- and then do an appropriate

15:10:16  14    search.

15:10:17  15         The LARs report?  Yeah, maybe.  So, what --

15:10:20  16    what I want to make clear is, I'm happy to go back, and

15:10:23  17    I've always been happy to go back to my client and talk

15:10:26  18    to them about anything we haven't produced.  And so far,

15:10:30  19    there really hasn't -- there hasn't been much.

15:10:32  20         We do have both -- going both ways,

15:10:34  21    financial information that my client is hesitant to

15:10:37  22    produce without an "attorney eye's only" addendum to

15:10:41  23    the -- to the stipulated protective order, which we

15:10:44  24    proposed back in December, and they haven't agreed to.

15:10:47  25         But, you know, we can get into that too, or

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:10:50   2    we could talk about it because they're -- both sides

15:10:53   3    want the same information from the other.  We want it.

15:10:56   4    Because they -- they're going to -- eventually, if they

15:10:58   5    prove any of their claims against Supreme, they're going

15:11:01   6    to have to prove damages.  And if any of those damages

15:11:04   7    are lost profits, they're going to have to provide

15:11:07   8    financial information in order to -- in order to justify

15:11:10   9    it.

15:11:10   10          So I'm happy, Judge, to go back and ask my

15:11:13   11   client about the LARs -- LARs reports for 2019 with

15:11:17   12   respect particularly to these, you know, to the -- any

15:11:21   13   loans closed by the individual defendants.  I do think

15:11:23   14   that's casting a much, much broader net.  Because any of

15:11:27   15   these loans, in all likelihood, are going to be closed

15:11:30   16   in the first, you know, in the first three or four

15:11:33   17   months.  Otherwise, the rest of it is -- is irrelevant.

15:11:37   18          But if it -- if it got us past another

15:11:40   19   conference with Your Honor, I would -- I would -- I'm

15:11:43   20   certainly going to have the conversation.  But going the

15:11:46   21   other way, we also -- we don't have any -- we don't have

15:11:50   22   any information from them about this investigation that

15:11:54   23   they did or who they know, who they knew back in 2019,

15:11:58   24   who they found out that documents were taken, we don't

15:12:01   25   have any clue.

                    M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:12:03   2         They brought in a forensic -- they brought

15:12:05   3    in a forensic consultant to do that.  We don't have any

15:12:09   4    of their reports.  They communicated with the DA's

15:12:11   5    office.  We don't have any of that information except

15:12:13   6    for the actual documents.  We were requesting more of

15:12:16   7    that.  We want to know when they figured out the

15:12:20   8    customers that allegedly were solicited or taken and

15:12:25   9    what they did about it in order to mitigate damages, if

15:12:28   10   they -- if they did, and whether or not they have

15:12:30   11   information that these customers left and it had nothing

15:12:34   12   to do with any wrongdoing by individual defendants.

15:12:36   13        We're entitled to all of that stuff going

15:12:38   14   back to 2019 when this first happened, and we've got

15:12:43   15   none of it; okay?  So we have the same -- and -- and

15:12:44   16   this isn't something that I think is ripe for the

15:12:47   17   court's really consideration at this point, but I want

15:12:50   18   to -- because we still have some more talking to do

15:12:54   19   about it.  But they're -- everything that they're

15:12:56   20   bringing up from the plaintiff's point of view, we have

15:12:59   21   it going back the other way.

15:13:01   22        And, you know, I'm -- we're -- we're

15:13:03   23   cooperating.  We believe that the idea of bringing every

15:13:09   24   single issue to the court is a -- is a waste of Your

15:13:11   25   Honor's time.

1      M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:13:12    2           MAGISTRATE JUDGE PEDERSEN:  So would you

15:13:13    3   want their LARs reports for 2019 as well?

15:13:17    4           Mr. Cole:  No, that -- we're assuming

15:13:19    5   anything that they closed in 2019 is not something that

15:13:23    6   the customers then came and closed another -- another

15:13:25    7   loan at Supreme.  So we don't need that exact -- we

15:16:05    8   don't need that exact document.  We just --

15:16:06    9           MAGISTRATE JUDGE PEDERSEN:  What are you

15:16:07   10   looking at -- what are you requesting from them?

15:16:17   11           Mr. Cole:  We're requesting the documents as

15:16:18   12   to what they found out about these customers who

15:16:21   13   alledgedly were solicited and all the information they

15:16:23   14   have on when credit reports were pulled or loan

15:16:26   15   applications were filed, what other evidence they have

15:16:28   16   that any of the individual defendants did any -- that

15:16:32   17   wrongdoing led to any -- any person coming over to

15:16:39   18   Supreme.

15:16:39   19           MAGISTRATE JUDGE PEDERSEN:  So essentially,

15:16:40   20   the information they gave to the district attorney?

15:16:44   21           Mr. Cole:  Well, that had to do -- certainly

15:16:44   22   that to the extent that there is other information about

15:16:46   23   what -- what files -- you know, they claim that files

15:16:49   24   were deleted.  Were all of those files recovered?  What

15:16:53   25   about the files in their Encompass loan system, which is

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:16:56   2   the exact same loan system that Supreme uses?  Were

15:17:00   3   those -- what of those were deleted, and what were

15:17:03   4   recovered?  In -- for what -- what particular customers

15:17:06   5   were there deletions?

15:17:08   6          MAGISTRATE JUDGE PEDERSEN:  So you're

15:17:08   7   looking for their expert's report back to them on what

15:17:13   8   he or she found in looking at the hard discs?

15:17:16   9          Mr. Cole:  I think that would be -- I think

15:17:16   10  that's something that we would be definitely entitled to

15:17:20   11  because we're not getting it from any -- anywhere else.

15:17:22   12  But right now, I think they're -- what Ms. Bass has said

15:17:27   13  is, an additional production from them is forthcoming

15:17:31   14  and if those provide more of those details, then, you

15:17:34   15  know, I'm not sure we do have an issue.

15:17:37   16         But right now, we -- we don't have any real

15:17:40   17  time information back in 2019 about what they knew about

15:17:44   18  particular files being deleted or customers being

15:17:51   19  solicited or taken improperly from Premium.  There has

15:17:54   20  to be some connection, Judge, between a Premium customer

15:17:58   21  and Supreme in order for there to be legitimate

15:18:01   22  discovery.  And -- so, you know, we're taking a slightly

15:18:05   23  broader view than that, but -- and it's hard.  They do

15:18:10   24  have an obligation.  I'm not saying before we produce

15:18:14   25  documents, but as part of their discovery obligations,

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:19:43  2    to tell us what information they have about these

15:19:46  3    customers for which they're seeking damages from

15:20:15  4    Supreme.

15:20:15  5          MS. MCCARTHY:  And, Your Honor, in addition

15:20:29  6    to that, we've -- and Mr. Cole made this point already.

15:20:41  7    We've -- we've asked for more broadly financial

15:20:43  8    information from Premium that we haven't received,

15:20:46  9    including the commission reports for the year that

15:20:50  10   the -- that the defendants left, the year of the end of

15:20:52  11   their employment, 2019, which is relevant in part to

15:20:56  12   their counterclaims for unpaid commissions.  And we've

15:21:00  13   yet to see that.

15:21:01  14         And, frankly, we've also asked for loan

15:21:05  15   applications generated, the number of clients serviced

15:21:07  16   by Premium and related financials because all of that is

15:21:10  17   relevant to, again, their counterclaims and -- and what

15:21:13  18   was closed by the individual defendants before they left

15:21:18  19   Premium.  Because, frankly, they had a vested interest

15:21:22  20   in having loans closed at Premium because then they were

15:21:26  21   expected to be paid the commissions on those loans.

15:21:29  22         In addition to that, they can't simply

15:21:31  23   choose to delay an application once it started at

15:21:34  24   Premium and then jump it over, to use opposing counsel's

15:21:38  25   words, to Supreme.  Because once the process gets going,

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:21:42   2   you can't simply ask the borrower to delay a closing on

15:22:00   3   their home because you're transferring -- because you're

15:22:02   4   changing employment.  So these clients didn't simply

15:22:06   5   jump from Premium to Supreme.

15:22:08   6          In some cases they chose to call up our

15:22:12   7   clients and say, hey, I want -- I have a house now, I

15:22:15   8   want to close on it.  And then our clients said, well,

15:22:18   9   we're not at Premium anymore, and some of those clients

15:22:22  10   then said, well, I want to follow you.  And we have

15:22:24  11   already produced documentation from those clients saying

15:22:28  12   we would like to follow you and withdraw our

15:22:32  13   applications from Premium.  We've disclosed that.

15:22:33  14          So there's no mystery on how certain

15:22:37  15   individuals were at Premium and then at Supreme.  They

15:22:39  16   didn't just jump there magically.

15:22:42  17          MS. BASS:  Perhaps, Your Honor --

15:22:42  18          MAGISTRATE JUDGE PEDERSEN:  I keep hearing

15:22:44  19   over and over again I'll show you mine if you show me

15:22:47  20   yours first.

15:23:00  21          MS. BASS:  No.  I mean, Your Honor, I'm

15:23:02  22   surprised to hear the reporting from the meet and confer

15:23:04  23   yesterday.  I mean, a lot of what the -- in particular,

15:23:05  24   the individual defendants raised for issues, and it was

15:23:08  25   basically we think there should be a document, is there

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:23:11    2    one?  And the answer was no, as confirmed by e-mail

15:23:15    3    today.

15:23:16    4          For example, they're looking for a letter

15:23:17    5    from Mr. Donoghue to the district attorney's office with

15:23:21    6    respect to the charges that were brought.  There's not a

15:23:24    7    letter from Mr. Donoghue to the district attorney's

15:23:26    8    office.

15:23:27    9          MAGISTRATE JUDGE PEDERSEN:  How did

15:23:27   10    information get to the district attorney?

15:23:29   11          MS. BASS:  Exactly.  And, again, it was a

15:23:31   12    phone call.  It was a meeting, as I told counsel

15:23:34   13    yesterday.  The district attorney said come down to the

15:23:37   14    office.  They brought the stack of documents.  We

15:23:39   15    literally have them saved on a disc, and we produced

15:23:43   16    every single one of them.  We didn't assert privilege

15:23:55   17    with respect to a single document.  The entire disc was

15:23:58   18    produced.

15:23:59   19          And, again, you know, sometimes in these

15:24:01   20    situations when you think there should be a document,

15:24:03   21    and they're telling you there are not, then depose

15:24:07   22    Mr. Donoghue.  Ask him if he drafted a letter.  Ask him

15:24:11   23    if there's a letter.  I can't -- I can't give them

15:24:13   24    something that doesn't exist.

15:24:14   25          So I'm really surprised to hear today with

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:24:17   2    respect to opposing counsel's report of the meet and

15:24:20   3    confer yesterday, because we were very open and very

15:24:23   4    confirming of what we have and what we don't have.  With

15:24:26   5    respect to those issues, though, we're not hiding the

15:24:30   6    ball.  You know, Mr. Cole is right.  Plaintiffs have the

15:24:33   7    obligation to prove the damages here.  But how do I say

15:24:36   8    to Mr. Cole our damages are blank because this is how

15:24:41   9    many loans were taken if I can't decide and determine

15:24:44   10   how many loans were taken?

15:24:45   11          And what I would -- what I would propose, if

15:24:47   12   the LARs are not an issue and the commission reports are

15:24:51   13   not an issue, that was something that Mr. Cole was going

15:25:03   14   to consult with counsel, as perhaps we could take a

15:25:08   15   15-minute break, if that's the watershed here, it

15:25:10   16   certainly is for us, perhaps we could take a 15-minute

15:25:13   17   break and Mr. Cole could attempt to get his client on

15:25:16   18   the phone.  Because I don't -- I don't know how these

15:25:18   19   would be an objectionable thing to produce given that

15:25:26   20   we're doing it under a confidential, and they would not

15:25:43   21   be shared with any other party.

15:25:46   22          Mr. Cole:  Judge, respectfully, I'm not

15:25:47   23   going to be put on spot for fifteen minutes with a

15:25:50   24   client that I don't even know that I can get in touch

15:25:52   25   with in fifteen minutes on that -- on that kind of thing

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:25:56   2     when I don't even know what a LARs is.  I -- I

15:25:59   3     apologize.  But I would -- I'm happy to cooperate

15:26:01   4     with -- with plaintiffs on all -- all aspects of

15:26:07   5     discovery, not just what Premium -- not what Supreme has

15:26:09   6     to produce in addition to what everything else they've

15:26:12   7     had to produce.

15:26:13   8          I'm happy, just like with the commission

15:26:15   9     reports that we talked about yesterday, LARs that we did

15:26:18   10    not talk about yesterday, to go back to my client and

15:26:22   11    see whether or not there's an interest in producing some

15:26:28   12    or all of that report with respect to 2019.  But I need

15:49:53   13    to be more informed myself before I can go and talk to

15:49:56   14    my client about it.

15:49:57   15         MS. BASS:  In October of last year, the

15:49:59   16    document demands were issued, and they requested

15:50:02   17    information relating to loans that were closed by the

15:50:08   18    Williamsville office, financial information, as well as

15:50:15   19    information about commissions paid in connection with

15:50:18   20    those loans.  So this isn't like a shock.  This isn't a

15:50:22   21    surprise.  This is -- this is a discussion that we're

15:50:25   22    having in connection with a meet and confer.

15:51:09   23         There are LARs.  They came up at the last

15:51:12   24    meeting that we had before Your Honor.  Everybody knows

15:51:16   25    these issues have been out there.  This is the rock.

58

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:51:19    2   This is the rock we can't get past.  And plaintiffs

15:51:21    3   can't take piecemeal discovery of what defendants think

15:51:25    4   are relevant based on their review of what the

15:51:29    5   individual defendants, who we already don't trust, tell

15:51:32    6   them is relevant.  We can't accept that piecemeal.

15:51:37    7          So perhaps, Your Honor, if -- you know, we

15:51:37    8   don't want to be in front of Your Honor with all due

15:51:40    9   respect.

15:51:45   10          MAGISTRATE JUDGE PEDERSEN:  What?

15:51:46   11          MS. BASS:  You know, perhaps the thing to do

15:51:55   12   here is to put this on another short leash so that

15:51:59   13   Mr. Cole can have an opportunity to discuss LARs with

15:52:02   14   his client.  They certainly are required to be reported

15:52:04   15   and created for the regulatory agencies.  So they

15:52:07   16   certainly exist.  We know those documents are out there.

15:52:10   17   We know those documents certainly have doc -- references

15:52:12   18   to loans that we believe are an issue and are relevant

15:52:17   19   for purposes of disclosure.

15:52:18   20          Some of those names, some of those loans

15:52:21   21   have even come up in their discovery that they've

15:52:24   22   already produced.  So there can't be an argument it's

15:52:27   23   not relevant.  So perhaps what we do is we adjourn for a

15:52:30   24   week in hopes that the commission issue and the LARs can

15:52:35   25   be resolved.  I'd certainly be happy to work with --

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

2   with both opposing counsel on issues with documents they

3   think should be there that just do not exist because

4   they were never created.

5          And once we have the universe of documents,

6   we'll be able to highlight our damages.  We'll be able

7   to say this is how many loans were closed over there

8   that should have been closed over here.  This is the

9   money we should have made on them.  This is our expenses

10   that we're taking out.  We'll be able to give them all

11   the information that they want and be able to move this

12   case forward to trial.

13          MAGISTRATE JUDGE PEDERSEN:  So what I'm

14   hearing is that if your client, Mr. Cole and

15   Mr. Calabrese, produce the LARs report, and if you have

16   one, the prospective client list that maybe the

17   individual defendants have, maybe they don't, perhaps

18   it's in the banker's box, who knows, as well as the

19   commission reports, those three items, that we would be

20   significantly further along the way.

21          And I understand you've got to find out what

22   is in a LARs report, what might be something that your

23   client doesn't want disclosed out of that.  But since

24   I'm supposed to take into consideration the burden and

25   expense of discovery, and if these reports truly already

1          M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:53:51  2   exist, it seems to me the shortcut here is to produce

15:53:55  3   the reports and let the plaintiffs go through and decide

15:53:58  4   what they think constitutes part of their claim.

15:54:04  5          Mr. Cole:  I -- I hear you, Judge, and I'm

15:54:06  6   happy to have that discussion on the LARs report with my

15:54:08  7   client.  As far as a customer list, I don't -- I've --

15:54:11  8   that's new to me in terms of a -- any kind of customer

15:54:15  9   list.  We've searched the files by any -- with the names

15:54:21  10  that we're aware of.  And as I've said, those names are

15:54:25  11  probably way over inclusive.

15:54:27  12          Anything that came up, any hit with those

15:54:32  13  names, was produced.  If there was a customer list, that

15:54:36  14  would -- presumably would have come up with it.  I'm

15:54:39  15  really unfamiliar with what they're talking about, and

15:54:42  16  I'm not aware of the individual defendants having

15:54:45  17  produced a customer list.

15:54:47  18          MS. BASS:  And the commission reports, Your

15:54:49  19  Honor.

15:54:49  20          MAGISTRATE JUDGE PEDERSEN:  Yes, he's

15:54:50  21  already agreed he's going to talk to his client about

15:54:53  22  those.

15:54:53  23          MS. BASS:  I'm sorry.  I didn't hear you.

15:55:00  24          MAGISTRATE JUDGE PEDERSEN:  So you're going

15:55:01  25  to talk with your client, Mr. Cole, about producing all

1        M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

15:59:09   2    commission reports.

15:59:20   3            MS. STILLER:  No, the prospective -- the

15:59:21   4    prospective -- he has equal ability, as we do, to read

15:59:25   5    the text messages, and to know that the text messages

15:59:29   6    reflect that the individual defendants agreed to and did

15:59:35   7    copy 1003s, which are the prospective client -- we asked

15:59:43   8    for all of this stuff.  But -- and we've had several

15:59:47   9    meets and confers.  And we've had meets and confers in

15:59:52   10   which we specifically, many in which we specifically

15:59:55   11   talked about commissions probably way back in December,

16:00:00   12   I think.

16:00:01   13           So, you know, we're not going to know -- I

16:00:04   14   don't know all the documents that they have, and I

16:00:06   15   certainly don't know all the advertising and the

16:00:10   16   contacts that they did and things of the sort.  That's

16:00:14   17   some information that we've requested in -- in

16:00:18   18   discovery.

16:00:18   19           But we -- we asked for all of this going

16:00:22   20   back to October of 2020.  There have been three

16:00:26   21   productions, I believe, from Supreme and two -- at least

16:00:32   22   two meet and confers on this, I believe.

16:00:36   23           Am I right, Maureen?

16:00:36   24           MS. BASS:  Yes.

16:00:37   25           MS. STILLER:  And it's not forthcoming.

```
 1              M. DONOGHUE, ET AL VS. C. NOSTRO, ET AL.

 2     resolve it in preparation for the 25th?

 3                MAGISTRATE JUDGE PEDERSEN:  Let me know what

 4     it is that you have unresolved.

 5                MS. STILLER:  Thank you.

 6                          *    *    *

 7                   CERTIFICATE OF REPORTER

 8

 9       I certify that the foregoing is a correct transcript

10     of the record to the best of my ability of proceedings

11     transcribed from the audio in the above-entitled matter.

12

13     S/ Karen J. Clark,  RPR

14     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

16:15:35
16:15:37
16:15:39
16:15:41